850 F.2d 876
 Robert HUGHES, Plaintiff-Appellee,
v.
PATROLMEN'S BENEVOLENT ASSOCIATION OF the CITY OF NEW YORK,
INC., J. Patrick Burns, and The City of New York,
Police Department, Defendants,
Patrolmen's Benevolent Association of the City of New York,
Inc., J. Patrick Burns, Defendants-Appellants.
 No. 639, Docket 87-7842.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 11, 1988.
Decided June 15, 1988.
 
 Irving Anolik, New York City, for defendants-appellants.
 Edward P. Dunphy, New York City (Denise M. Dunleavy, New York City, of counsel), for plaintiff-appellee.
 Before LUMBARD and CARDAMONE, Circuit Judges and LEISURE, District Judge.*
 CARDAMONE, Circuit Judge:
 
 
 1
 The Patrolmen's Benevolent Association of the City of New York (PBA) and J. Patrick Burns appeal from a June 9, 1987 judgment in favor of appellee Robert Hughes in the United States District Court for the Southern District of New York (Owen, J.) following a jury trial. This appeal is from a jury verdict awarding Hughes substantial damages for intentional infliction of emotional distress and prima facie tort as well as awarding punitive damages. The jury found that appellants embarked on a deliberate and malicious vendetta against the plaintiff aimed at securing revenge for actions which the appellants should have known he did not do. The jury verdict here furthers Bacon's dictate that because revenge is a form of "wild justice," the "more ought law to weed it out." F. Bacon, Of Revenge, in Essays or Counsels--Civil and Moral, reprinted in 3 Harvard Classics 15 (C.W. Eliot ed. 1909).
 
 FACTS
 
 2
 Plaintiff Robert Hughes, a New York City Police Sergeant since 1964, was assigned on September 10, 1979 to the Absence Control Unit of the Police Department's Health Services Division. His duties involved preventing abuse by police officers of the Police Department's unlimited sick leave policy. Deputy Chief Ryan, the commanding officer of the Health Services Division and Sgt. Hughes' supervisor in 1979-80, credited Hughes with reducing absenteeism and saving the Department several million dollars in 1980 as compared to 1979. Based on this performance, he recommended Hughes for a promotion to Sergeant Special Assignment with a concomitant raise.
 
 
 3
 The incident that triggered this litigation involved Police Officer Salvatore Troia, who was injured on December 28, 1979 while on duty at the 19th Precinct. According to his wife, Troia, despite suffering from physical pain and serious depression, appeared as ordered on October 9, 1980 for limited duty. The next day he committed suicide.
 
 
 4
 Appellant Burns--a police officer for over 30 years--was on "full excusal" from duty at the time of Troia's suicide and was serving as a First Vice-President of the PBA, the labor union representing police officers, and as a Trustee of the New York City Pension Board, which determined disability pensions for members of the police department. In 1979 Officer Burns was assigned to the 19th Precinct where he had served with his friend, Officer Troia. Burns testified at trial that two members of the Health Services Division, Sergeants Cruse and Powers, had visited Officer Troia at his home during his period of sick leave. But, according to Hughes, Troia had never been classified as a sick leave abuser and had never come under his supervision or investigation.
 
 
 5
 On October 10, 1980--the same date of Officer Troia's suicide--the PBA initiated its own investigation into what role the Health Services Division might have played in his death. The Police Department's official report concerning Troia's death concluded that Sergeant Hughes had no involvement with Troia during the period of sick leave.
 
 
 6
 The core of Hughes' claim against Burns and the PBA is that they blamed him for Troia's death and, as a result, embarked on a deliberate and malicious vendetta against him aimed at securing revenge. Hughes introduced evidence that the PBA hired two investigators to look into his involvement in the suicide and that the PBA told the investigators that it wanted him transferred out of the Health Services Division "any way you can"--even if it meant framing him. As a result of appellants' campaign of harassment and the false dissemination to Hughes' fellow officers that Sergeant Hughes was responsible for Troia's suicide, many referred to Hughes as "Dr. Death." Hughes claimed that appellants' tactics resulted in harassment of him and his wife, caused him to be involuntarily transferred, discussed below, and denied him the promotion and raise recommended by Ryan. A substantial amount of highly contested testimony was admitted concerning the nature of and activities constituting this campaign of harassment.
 
 
 7
 Hughes claimed that Burns, the PBA, and the Police Department conspired to transfer him out of the Health Services Division. After Troia's death, appellee was transferred involuntarily from Health Services to applicant processing, then to applicant investigations, and finally to street patrol in a Queens precinct. While on patrol Hughes sustained two injuries that eventually led to his retirement on a disability pension on December 10, 1986.
 
 PROCEEDINGS BELOW
 
 8
 Hughes instituted this action in 1982 against appellants and the New York City Police Department alleging federal civil rights claims pursuant to 42 U.S.C. Sec. 1983 (1982) and state common law tort claims. An amended complaint alleged the following three causes of action against Burns, PBA, and the New York City Police Department: prima facie tort, intentional infliction of emotional distress, and deprivation of civil rights. Jurisdiction was based on 28 U.S.C. Sec. 1331.
 
 
 9
 Appellants first objected to the district court entertaining jurisdiction when they moved under Fed.R.Civ.P. 12(b)(6) to dismiss appellee's complaint. They argued that, as private parties, they were not subject to liability under Sec. 1983 and hence, absent federal question jurisdiction under Sec. 1331, the district court also lacked pendent jurisdiction over the state law claims. The district court denied the motion to dismiss on the ground that a private defendant is subject to Sec. 1983 liability when that party willfully participates in joint activity with a state officer. See United States v. Price, 383 U.S. 787, 794, 86 S.Ct. 1152, 1156-57, 16 L.Ed.2d 267 (1966). The court ruled that the complaint "clearly pleaded factual allegations which undoubtedly raise a claim pursuant to Sec. 1983" such that the court's jurisdiction rested either on Sec. 1331 or Sec. 1343 (jurisdiction over federal civil rights actions).
 
 
 10
 The case proceeded to trial and the jury found the PBA liable on the state law claims and awarded Hughes $370,000 in damages, allocated as follows: intentional infliction of emotional distress, $100,000; prima facie tort, $95,000; and punitive damages, $175,000. The jury found Burns liable on the same claims and awarded Hughes $400,000, allocated as follows: intentional infliction of emotional distress, $125,000; prima facie tort, $100,000; and punitive damages, $175,000. Hughes' total award from the jury amounts to $770,000. The New York City Police Department was not found liable on any grounds. Consistent with the joint activity theory that provided federal jurisdiction and the verdict as to the Police Department, neither the PBA nor Burns was held liable for violating Hughes' civil rights.
 
 
 11
 Subsequent to the jury trial and the entry of an adverse judgment, the PBA and Burns moved pursuant to Fed.R.Civ.P. 59 for a new trial, arguing that the finding of liability was against the weight of the evidence, that the jury award for both prima facie tort and intentional infliction of emotional distress constituted an improper double recovery, and that the overall damage award was grossly excessive. The district court rejected the challenges to the finding of liability and the amount of the overall award on the grounds that the evidence supported the jury's finding that the PBA and Burns "maliciously and deliberately destroyed" Hughes' career and that the award was not excessive. The district court also rejected appellants' objection to recovery under both state law tort theories. After noting appellants' failure previously to advance their double recovery argument and their consent to the form and accompanying instructions furnished to the jury, the district court found that the jury form--which specified the amount of damages caused by each defendant for each tort--prevented the prohibited award of a "double recovery."
 
 
 12
 We reverse the judgment insofar as it found appellants liable under both tort theories and otherwise affirm.
 
 DISCUSSION
 
 13
 Several arguments are made on appeal. First, appellants assert that the district court should have dismissed the federal claim--or not retained jurisdiction over it--and concurrently should have declined to exercise pendent jurisdiction over the state law claims. Second, they claim that the trial court misconstrued New York law when it permitted the jury to consider separate, non-exclusive damages for two intentional torts. Third, they argue that the overall damage award of $770,000 is grossly excessive. Appellants contend in addition that the evidence in support of the punitive damages award is insufficient, that damages arising from allegedly lost wages should not have been submitted to the jury, and that their cross-examination of Officer Troia's widow was improperly circumscribed. We discuss each argument in turn.
 
 I Federal Jurisdiction
 
 14
 Appellants urge that from the inception of this suit not even a "scintilla" of evidence supported appellee's Sec. 1983 claim that the PBA and Burns conspired with the New York City Police Department to violate appellee's civil rights. They argue that Hughes contrived the federal civil rights suit in order to invoke pendent jurisdiction over the state claims. Jurisdiction in this case was wholly premised on allegations that a conspiracy existed between private party appellants and the New York City Police Department, the only alleged state actor. Appellants contend Hughes' suit should have been dismissed when they originally made their 12(b)(6) pretrial motion because the complaint failed to allege facts sufficient to establish the conspiracy, or later during the trial when the transparency of the federal claim surfaced. The federal claims, appellants continue, should never have been submitted to the jury. Moreover, since the jury found that the Police Department was not liable, appellants argue that this proves jurisdiction never existed. We discuss the issue of jurisdiction as it arose before, during, and after the trial.
 
 
 15
 The exercise of federal jurisdiction must first be tested against the allegations in the complaint. To withstand a motion to dismiss, a federal claim must be stated with "substance sufficient to confer subject matter jurisdiction." United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). The required specificity of pleadings must be examined by the standard that "complaints containing only 'conclusory,' 'vague,' or 'general allegations' of a conspiracy to deprive a person of constitutional rights will be dismissed." Ostrer v. Aronwald, 567 F.2d 551, 553 (2d Cir.1977) (per curiam). Specificity is required in order "to enable [defendants] intelligently to prepare their defense." Id.
 
 
 16
 Hughes did not allege that the PBA is a state actor itself for state action purposes. Rather, appellee's Sec. 1983 claim and its jurisdictional counterpart, 28 U.S.C. Sec. 1343, rested on allegations that the New York City Police Department participated in the conspiracy, thus constituting joint activity considered to be state action by all parties involved. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 & n. 7, 90 S.Ct. 1598, 1606 & n. 7, 26 L.Ed.2d 142 (1970) (private party involved in a conspiracy liable under Sec. 1983 if private party a "willful participant in joint activity with the State or its agents") (quoting United States v. Price, 383 U.S. at 794, 86 S.Ct. at 1157). Hughes alleged that the PBA and Burns conspired with Hughes' commanding officers in the Police Department to cause the loss of his position in the Health Services Division. The complaint further alleged that the PBA and Burns--with the knowledge and express or implied consent of the Police Department--hired private investigators and placed Hughes under surveillance in violation of his constitutional rights. In an allegation directed solely at the Police Department, the complaint asserted that the Department's Internal Affairs Division--through its knowledge and inactivity concerning the campaign of harassment directed at Hughes--violated his rights. Moreover, appellee alleged that the Police Department demanded that he voluntarily request a transfer before it unilaterally transferred him. Thus, viewing the complaint on its face, it alleged facts sufficient to establish--assuming the facts were proven--a violation of Sec. 1983. In light of this, the district court properly rejected appellants' Rule 12(b)(6) motion to dismiss made prior to trial for want of federal subject matter jurisdiction and correctly held that jurisdiction existed either pursuant to 28 U.S.C. Sec. 1331 or Sec. 1343.
 
 
 17
 We turn next to appellants' argument that, as it became evident during the trial that the Sec. 1983 claim was without merit, the district court should have dismissed this claim and declined jurisdiction. Federal subject matter jurisdiction may be raised at any time during litigation and must be raised sua sponte by a federal court when there is an indication that jurisdiction is lacking. Fed.R.Civ.P. 12(h)(3); Bender v. Williamsport Area School Dist., 475 U.S. 534, 106 S. Ct. 1326, 1331, 89 L.Ed.2d 501 (1986) (jurisdiction of federal courts must be assured even if conceded); see Dunton v. County of Suffolk, 729 F.2d 903, 910 (2d Cir.1984) ("[T]he district court has an obligation to examine the substantiality of the federal claims throughout the litigation.").
 
 
 18
 If, during the course of trial, it becomes apparent that the federal claims are discernibly meritless, both the federal and pendent state law claims must be dismissed. See United Mine Workers, 388 U.S. at 727, 86 S.Ct. at 1139-40; Dunton, 729 F.2d at 910-11; Crane Co. v. American Standard, Inc., 603 F.2d 244, 254 (2d Cir.1979). For the district court to retain jurisdiction, a federal claim must be supported by some evidence. In this case, the record contains evidence of the Police Department's involvement in the alleged conspiracy to destroy appellee's career. The proof revealed detailed accounts of the Department's promotion system; the activity or inactivity of its Internal Affairs Division; and the knowledge, endorsement, and assistance by the Department to the PBA and Burns in their efforts. The evidence pointed to the relationship between the Department and appellants in the dissemination of accusations that blamed Hughes for Troia's death. This evidence was plainly sufficient for the district court to retain jurisdiction.
 
 
 19
 Appellants' final jurisdictional point derives from the fact that the jury returned a verdict finding that they and the Police Department were not liable to Hughes on his cause of action under Sec. 1983. Somehow appellants believe that this demonstrates that federal jurisdiction was lacking ab initio. Interestingly, the jury originally returned a verdict holding that the appellants and the City of New York had violated Hughes' civil rights and making a substantial award. The trial court properly ruled that this verdict was inconsistent with the jury's answers to certain interrogatories, and directed the jury to deliberate further. The findings in the jury's amended verdict that the New York City Police Department was not liable to Hughes and that the appellants--under the joint activity theory--were not acting under color of state law when they committed torts against appellee does not affect the sufficiency of the complaint. Plainly, a federal claim need not be one guaranteed to succeed to gain entrance to a federal forum. In fact, appellants' argument that appellee's Sec. 1983 cause of action is jurisdictionally defective because of a negative jury verdict itself borders on being frivolous.
 
 II Recovery for Two Separate State Torts
 
 20
 Appellants next assert that the district court erred in permitting the jury to consider damages for two intentional torts under the pendent state common law claims: intentional infliction of emotional distress and prima facie tort. Appellee counters that these two torts involve different wrongs and cause different injuries--economic versus emotional injuries--and that, in any case, intentional infliction of emotional distress is not a traditional tort which precludes separate recovery for a prima facie tort. We disagree with these contentions.
 
 
 21
 Under New York law, a traditional tort, as opposed to a prima facie tort, is any "specific recognized tort." Board of Educ. v. Farmingdale Classroom Teachers Assoc., 38 N.Y.2d 397, 406, 380 N.Y.S.2d 635, 343 N.E.2d 278 (1975). Intentional infliction of emotional distress has been recognized as an independent tort in New York for over a quarter of a century. Halio v. Lurie, 15 A.D.2d 62, 222 N.Y.S.2d 759 (2d Dept.1961). Justice Holmes' view that alleging "the intentional infliction of temporal damage" states a cause of action which "requires a justification if the defendant is to escape...." Aikens v. Wisconsin, 195 U.S. 194, 204, 25 S.Ct. 3, 5, 49 L.Ed. 154 (1904), later evolved in New York into the prima facie tort. The elements of that tort are: (1) intentional infliction of harm, (2) resulting in special damages, (3) without excuse or justification, and (4) by an act or series of acts that would otherwise be lawful. Burns Jackson Miller Summit & Spitzer v. Lindner, 59 N.Y.2d 314, 332, 464 N.Y.S.2d 712, 451 N.E.2d 459 (1983).
 
 
 22
 The existence of a traditional tort does not foreclose pleading a prima facie tort, but double recovery is not allowed. Id. at 332-33, 464 N.Y.S.2d 712, 451 N.E.2d 459. In short,
 
 
 23
 [w]here relief may be afforded under traditional tort concepts, prima facie tort may not be invoked as a basis to sustain a pleading which otherwise fails to state a cause of action in conventional tort. However, where a traditional tort remedy exists, a party will not be foreclosed from pleading, as alternative relief, a cause of action for prima facie tort.
 
 
 24
 Freihofer v. Hearst Corp., 65 N.Y.2d 135, 143, 490 N.Y.S.2d 735, 480 N.E.2d 349 (1985). Here, it was proper to allow plaintiff to plead, in the alternative, both torts. Further, evidence may be admitted, argument made, and jury instructions given with respect to each. What New York law prohibits is recovery of damages for both a traditional tort such as the intentional infliction of emotional distress and for a prima facie tort.
 
 
 25
 The district court opined that any double recovery problem was prevented or cured by the court's careful jury form that compelled the jury to state the amount of damages awarded for each tort against each defendant. Yet, neither the jury charge, jury form, or jury verdict divided the damages according to the type of damages, as the appellee argues. Moreover, appellee in his brief on appeal asserts that after the PBA began "its campaign against him" he was unable to socialize with fellow officers and that this conduct caused his transfer "out of applicant investigations." Hughes continues that "the impact of all this, including the lack of camaraderie and the lack of possibilities for future advancement in the department was devastating." In sum, appellee alleges that appellants' conduct caused both his emotional distress and his lost wages, the theory behind both torts.
 
 
 26
 Although special damages are not required to be pleaded to maintain a claim for intentional infliction of emotional distress, see Henaghan v. Dicuia, 98 A.D.2d 742, 469 N.Y.S.2d 446 (2d Dept.1983); Long v. Beneficial Fin. Co., 39 A.D.2d 11, 14, 330 N.Y.S.2d 664 (4th Dept.1972); Halio, 15 A.D.2d at 65, 222 N.Y.S.2d 759, all compensatory damages, including special damages, caused by the commission of a traditional tort are recoverable in one cause of action; that is, those responsible for a tortious injury must respond for all damages resulting from their conduct. See 36 NY Jur.2d Damages Sec. 53 (1984). Since a traditional tort here provides compensation for the conduct giving rise to liability, the nontraditional prima facie tort cannot also provide damages for the same injuries caused by the same conduct. To allow a recovery for both torts would permit the double recovery rejected by New York's highest court in Burns Jackson and Freihofer. Thus, the judgment holding the PBA liable to Hughes for $95,000 and Burns liable to Hughes for $100,000 for prima facie tort must be reversed and the jury awards in those amounts vacated.
 
 
 27
 Appellants further argue that New York law requires that no prima facie tort action or award may survive unless the defendant's sole motivation was "disinterested malevolence" directed toward the plaintiff, see Rodgers v. Grow-Kiewit Corp.-Mk, 535 F.Supp. 814, 816 (S.D.N.Y.), aff'd mem., 714 F.2d 116 (2d Cir.1982), and absent evidence to demonstrate such a malevolent motivation this tort should not have been charged to the jury. In light of our reversal of the recovery for the prima facie tort, it is unnecessary to discuss or rule on this argument.
 
 III Basis for and Amount of Damages
 
 28
 We next consider appellants' contention that there is insufficient evidence to support the damages awarded to Hughes for intentional infliction of emotional distress. This tort "predicates liability on the basis of extreme and outrageous conduct, which so transcends the bounds of decency as to be regarded as atrocious and intolerable in a civilized society." Freihofer, 65 N.Y.2d at 144, 490 N.Y.S.2d 735, 480 N.E.2d 349; see Fischer v. Maloney, 43 N.Y.2d 553, 557-58, 402 N.Y.S.2d 991, 373 N.E.2d 1215 (1978); Restatement (Second) of Torts Sec. 46(1) (1965). Evidence in the record both supports and contradicts Hughes' argument that appellants' effort to drive him out of the Health Services Division rose to this level. Given that contested facts were at the heart of this issue, the district court properly denied appellants' motion for summary judgment. Hence, the focus of review is on the jury charge regarding intentional infliction of emotional distress, which stated:
 
 
 29
 The second claim, intentional infliction of emotional distress, is defined as follows: One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another. Liability is to be found only where the conduct has been so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.
 
 
 30
 This jury charge conforms in all respects to New York's strict requirements for the tort of intentional infliction of emotional distress as expressed in Fisher and the Restatement (Second) of Torts. See Martin v. Citibank, N.A., 762 F.2d 212, 220 (2d Cir.1985). We think reasonable jurors could have determined that Hughes prevailed on each required element to establish the commission of this tort.
 
 
 31
 A similar analysis applies to appellants' claim that there is insufficient evidence to support the jury's award for punitive damages. We recognize that punitive damages are an extraordinary sanction. We also recognize that an award of punitive damages is reversed only when it is "so high as to shock the judicial conscience and constitute a denial of justice." Zarcone v. Perry, 572 F.2d 52, 56-57 (2d Cir.1978). The "shock the conscience" test is also used to determine whether the trial court abused its discretion in refusing to reduce a jury award, Nairn v. National R.R. Passenger Corp., 837 F.2d 565, 566-67. To determine whether discretion has been abused an appellate court must make its own "detailed appraisal of the evidence bearing on damages." Grunenthal v. Long Island Rail Road Co., 393 U.S. 156, 159, 89 S.Ct. 331, 333, 21 L.Ed.2d 309 (1968). In the case at bar the trial court charged the jury that it could award punitive damages only if appellants' acts were "malicious," "inspired by ill will," or in "wanton and reckless disregard of the plaintiff's rights," but that such damages were "only to be awarded for the most offensive conduct." The jury determined that appellants' conduct rose to that level. After examining the evidence bearing on damages, we decline to disturb its verdict.
 
 
 32
 Another contested issue is whether damages allegedly arising from appellee's lost wages should have been submitted to the jury. Appellants argue that any such award would be based on pure speculation. Considerable evidence--which the jury was free to credit or discredit--was introduced to explain Hughes' failure to obtain the job of Sergeant Special Assignment with a salary and pension increase. Some of this proof suggested that Hughes' chances for promotion but for appellants' activities were good, some indicated that they were poor. Given that the jury was adequately charged with respect to both theories, resolution of this issue lay squarely with it.
 
 
 33
 Appellants additionally assert that the overall verdict of $770,000 is so excessive as to suggest the possibility that it was the result of passion or prejudice and that such a result should be remedied on appeal. See Perfect Fit Indus., Inc. v. Acme Quilting Co., 494 F.Supp. 505, 508-09 (S.D.N.Y.1980); see also Zarcone, 572 F.2d at 56-57. They claim that the total award is so high as to shock the judicial conscience--the same standard as that applied to an award of punitive damages. Zarcone, 572 F.2d at 56-57. In our view the overall damages which we have reduced to $575,000 in this case are not so grossly excessive as to shock our conscience. Consequently, there is no need for a new trial on damages.
 
 
 34
 Finally, the trial court, over objection, permitted appellee's counsel to read into the record an affidavit of Officer Troia's widow under Fed.R.Evid. 901(b)(1) and (7), but refused to permit appellants' counsel to use an amended bill of particulars from a related suit to cross-examine her for possible impeachment purposes. This ruling is confided to the sound discretion of the trial judge which, absent an abuse of that discretion, must stand. See, e.g., United States v. Esdaille, 769 F.2d 104, 108 (2d Cir.), cert. denied, 474 U.S. 923, 106 S.Ct. 258, 88 L.Ed.2d 264 (1985). We see no such abuse here.
 
 CONCLUSION
 
 35
 The judgment insofar as it granted recovery for prima facie tort against the PBA for $95,000 and Burns for $100,000 is reversed and these awards are respectively vacated. The judgment is otherwise affirmed in all respects.
 
 
 36
 Reversed in part, and affirmed in part.
 
 
 
 *
 Honorable Peter K. Leisure, United States District Judge for the Southern District of New York, sitting by designation