**600**

Denise DEAN, Plaintiff,

v.

**PEPSI–COLA BINGHAMTON BOT-
TLERS, A DIVISION OF ALISTAR
BEVERAGES CORP., Defendant.**

No. 94–CV–49.

United States District Court,
N.D. New York.

Aug. 16, 1995.

Aswad & Ingraham, Binghamton, NY (Thomas A. Saitta, of counsel), for plaintiff.

Clifton Budd & DeMaria, New York City (Karen A. Casey, of counsel), for defendant.

## MEMORANDUM, DECISION & ORDER

McAVOY, Chief Judge.

### I. BACKGROUND

A trial commenced in this Title VII action on May 23, 1995. On June 1, 1995, the Court entered judgment against the defendant, Pepsi–Cola Binghamton Bottlers ("Pepsi") based on a jury verdict which found that the defendant had terminated the plaintiff, Denise Dean, on the basis of her pregnancy. The judgment also reflected the jury's finding of no cause of action on plaintiff's Title VII claim of hostile work environment.

Defendant now moves pursuant to Fed. R.Civ.P. 50 for a directed verdict and Fed. R.Civ.P. 59 for a new trial. Plaintiff has moved for reasonable attorney's fees and costs pursuant to Fed.R.Civ.P. 54. As discussed below, however, the parties have reached an agreement on that motion, and the court need not address it.

### II. DISCUSSION

#### A. Title VII Claim—Discriminatory Termination

The review of a Title VII claim involves a three step analysis. First, the plaintiff must show a prima facie case of unlawful discrimination. After this has been established, the burden of production switches to the defendant to show that there was a legitimate and nondiscriminatory reason for its actions. If defendant shows a nondiscriminatory reason, the burden switches back to the plaintiff to prove by a preponderance of the evidence that the nondiscriminatory reasons stated by the defendant were merely a pretext for discrimination. *McDonnell Douglas Corp. v. Green,*

411 U.S. 792, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). While the burden of production switches to the defendant after the plaintiff shows a prima facie case of discrimination, the burden of persuasion remains with the plaintiff at all times. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ An employer who discriminates is unlikely to leave direct evidence of discriminatory intent, and therefore, the plaintiff is often forced to rely on circumstantial evidence to support her claim. *Rosen v. Thornburgh,* 928 F.2d 528, 533 (2d Cir.1991), *citing, Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 464–65 (2d Cir.1989).

### 1. Qualified Employee Testimony

■ To show a prima facie case of unlawful termination, the plaintiff must show that: (1) she was a member of a protected class; (2) she was qualified for the position and/or was satisfying the employer's normal work requirements; (3) despite her qualifications she was terminated from her position; and (4) in a typical termination case she must show that she was replaced by a worker who is not a member of the protected class. *Carter v. AT & T Communications,* 759 F.Supp. 155, 158–59 (S.D.N.Y.1991). At trial, the only one of these factors left for determination was whether plaintiff was qualified for her position and/or was satisfying her employer's normal work requirements.

Defendant claims that plaintiff's termination was nondiscriminatory because it was due to her unsatisfactory job performance rather than her pregnancy. At trial, defendant provided testimony from a number of employees pointing to examples of plaintiff's mistakes including problems with her route settlements, an uncooperative attitude with route salesmen, her tardiness on a number of occasions, and a situation in which she double billed a customer.

Plaintiff admitted at trial that she was late to work on approximately twenty occasions. Brigitte Stella, plaintiff's immediate supervisor, testified that plaintiff was tardy on numerous occasions. However, plaintiff's tardiness on only three occasions was recorded as a disciplinary incident. Additionally, Michael Matney, Stella's supervisor, testified that plaintiff's tardiness was not a basis for her termination.

Stella and Karen Censak, a co-worker, testified that as an example of plaintiff's poor work performance, she failed to close route settlements on a number of occasions and did not leave notes explaining such failures. They did not, however, relate specific incidents of such failures. Defendant produced no written record of such failures. Plaintiff testified, on the other hand, that she never failed to close her route settlements, which left an issue of credibility for the jury to determine.

Defendant also provided testimony regarding an incident in August 1991 where the Norand computer units used by route salespersons were not updated with sales information for the following day. Plaintiff testified that she did not fail to reset the computer units and blamed the incident on a possible power surge caused by a thunderstorm in the area after her shift ended. The fact that a thunderstorm occurred on that night was corroborated by a newspaper article. In relation to this incident, plaintiff admitted that in her previous deposition she had said that she was not responsible for resetting the computer units. However, she also testified during redirect examination that in her deposition she had been referring to the initial setting of the computer units by the truck drivers before she downloaded information, not her resetting of the units at the end of the night. Plaintiff also testified that she told Matney of the possibility of a power surge when he questioned her concerning the incident. Matney testified that he did not recall the conversation. This clearly left another question of fact for the jury to decide.

Stella and Matney also testified as to plaintiff's problems in producing accounts receivable reports. Stella and Matney provided differing explanations of the problems with these reports. Matney testified that plaintiff failed to generate such reports on numerous occasions while Stella only related one incident of untimeliness. Stella also admitted during cross-examination that due to the pro-

cess used for obtaining the information in such reports, the information would necessarily be two days old when presented.

Defendant provided the testimony of route salespersons Richard Rebello and John Beauter who stated that through the course of plaintiff's employment, she repeatedly harassed them while they checked in their trucks at the end of their shift. Matney also testified as to complaints from drivers and the warehouse manager regarding plaintiff's attempts to hurry the check-in procedures. Plaintiff, on the other hand, testified that she experienced no problems in dealing with the truck drivers and that she had been specifically instructed by Matney to make sure that the drivers provided their work to her in a timely manner.

Defendant also provided testimony of plaintiff's purported difficulties with route time study reports. Ronald Cole testified that the problems encounter could have been caused by plaintiff failing to enter disks containing study information into the proper computer, or by using more than the maximum number of computer disks allowed in creating the route time study reports. The latter would apparently cause the loss of any information contained on additional disks. Defendant provided three examples of problems with route study time reports.

In regard to the loss of information, defendant provided a "weekly recap sheet" expressing the route time study for Route 321 during the week ending September 13, 1991. This recap showed that no data for the Route was entered that week. Cole testified that such a deficiency was due to plaintiff's failure to enter a disk containing the information. However, on cross-examination, Cole testified that if this problem was caused by a missing disk, there would be no entries for the other routes contained on the disk either, which was not the case. Route 321 was the only route missing information for that time period. Additionally, further evidence showed that Route 321 was handled by a substitute driver on the relevant date.

In regard to the duplication of route time study data, a weekly recap for the week ending February 21, 1992 was entered into evidence. That recap reported that, on Route 323, the Monday of that week contained 25.7 hours, which Cole stated was the result of plaintiff using a disk from the previous day thereby combining the previous day's information with Monday's. However, other routes from the same day did not contain such problems and the rest of the information for Route 323 was not combined with the results of a previous day. Cole also indicated in cross-examination that the total number of stops listed was incorrect and that the mistake was caused by a computer problem.

Defendant also provided testimony regarding the route time study for December 13, 1991 and the fact that no entries for any of the routes were made. However, Cole testified that on at least one occasion during the fall or winter of 1991, he came to Binghamton to make changes in the route time study program and on such day the computer was shut down and no entries recorded.

## 2. Pregnancy Discrimination Testimony

Plaintiff testified as to comments made by office manager, Brigitte Stella, and the general manager, Michael Matney, in her presence and that of several co-workers regarding her, women with small children, and pregnant women in general. Plaintiff testified as to comments by Stella made before she became pregnant, apparently to show Stella's general hostility toward pregnant women and women with small children. For example, plaintiff testified that Stella made comments to her that childbirth was excruciatingly painful and that another Pepsi employee looked like she had swallowed a watermelon after she became pregnant.

Plaintiff testified that upon informing Matney of her pregnancy in September 1991, he commented that "there's life after Pepsi." Matney denied making such comment. She also testified that the day after she informed Matney of her pregnancy, Stella commented in front of her to several co-workers, including Matney, that "you have to keep pregnant women happy." Testimony presented by the defendant denied that such a comment was made, but also noted that if such a comment was made, it was not directed at plaintiff or

would only have been meant in a joking manner.

Plaintiff also testified that shortly before she was terminated, she overheard Stella having a conversation with Censak on the other side of a four-foot partition in which Stella said, allegedly referring to plaintiff, "she'll be calling in sick more often near the end and later she'll be needing more time off," and noting that "she can't even make it down the hallway." Stella and Censak denied that such conversation took place.

Plaintiff also testified that, after explaining that her doctor would consider her disabled two weeks before her anticipated due date, Stella told her she would have to use a week of her vacation time just before the birth. Stella testified that she merely gave plaintiff the option to use her paid vacation while on her unpaid maternity leave, but that she was free to take the vacation beforehand. Plaintiff admitted that she did not discuss her problems with Stella and Matney with anyone in the company.

Plaintiff testified that her paycheck was reduced on one occasion. However, upon making a claim to the Department of Labor, her regular pay was restored. In regard to this incident the Department of Labor later found that the defendant had been illegally withholding payment of overtime and keeping those additional hours to supplement employees' checks on weeks where they worked fewer hours than normal. Stella testified that she was not even aware of plaintiff's claim until the Department of Labor investigation until almost year later.

Additionally, Censak testified that she had not been harassed because of her earlier pregnancy. However, during cross-examination it became clear that Censak's pregnancy took place before Stella was appointed office manager.

**B. Judgment as a Matter of Law**

Fed.R.Civ.P. 50(b) states that:

[w]henever a motion for a judgment as a matter of law made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Such a motion may be renewed by service and filing not later than 10 days after entry of judgment ... If a verdict is returned, the court may, in disposing of the renewed motion, allow the judgment to stand or may reopen the judgment ...

In this case, the court reserved on the defendant's motion for judgment as a matter of law and sent all issues to the jury. The jury returned a verdict in favor of the plaintiff. Defendant renewed its motion pursuant to Rule 50(b).

■ The standard for deciding such a motion is the same whether the motion is made before the case is submitted to the jury or after the jury has returned its verdict. Since judgment as a matter of law deprives the non-moving party of a determination of the facts by a jury, it should be granted "cautiously and sparingly." 9A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2524 (1995). The Second Circuit has elaborated on the standard for granting Rule 50 motions: "[s]imply stated, it is whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [individuals] could have reached." *Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir.1970). In considering such a motion, "the evidence must be viewed in the light most favorable to the party against whom the motion is made and [she] must be given the benefit of all reasonable inferences which may be drawn in [her] favor from that evidence." *Id.* A judgment as a matter of law is only appropriate when there is "such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result o[f] sheer surmise and conjecture." *King v. Macri,* 800 F.Supp. 1157, 1160 (S.D.N.Y.1992), *quoting, Sorlucco v. New York City Police Dep't,* 971 F.2d 864, 871 (2d Cir.1992).

■ As detailed, there were numerous instances of contradicting trial testimony in this case. Many of the contradictions involved proof relating to plaintiff's work performance, and accordingly, in light of the

applicable standard, the question of whether plaintiff was qualified for her job and/or living up to her employer's normal performance requirements was clearly a question for the jury. Additionally, there was much conflicting testimony regarding plaintiff's claim that her pregnancy was a reason for her termination. More specifically, there was conflicting testimony as to whether the comments alleged by plaintiff were, in fact, made. Accordingly, this issue was properly left to the jury as well. Finding so, the court denies defendant's motion for a directed verdict pursuant to Rule 50.

### C. New Trial

A less stringent standard applies to a motion for a new trial pursuant to Rule 59. "The trial judge is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner." *Bevevino v. Saydjari,* 574 F.2d 676, 684 (2d Cir.1978). The court may grant a new trial any time it becomes convinced that the jury has "reached a seriously erroneous result or that the verdict is a miscarriage of justice." *King,* 800 F.Supp. at 1160, *quoting, Sorlucco,* 971 F.2d at 875. It is now well settled law that a trial judge's disagreement with the jury's verdict is not sufficient reason alone to grant the motion for a new trial. *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 691 (2d Cir.1983); *see Saloomey v. Jeppesen & Co.,* 707 F.2d 671, 679 (2d Cir.1983).

It is clear that the trial in this action produced a large amount of conflicting testimony, as discussed previously. However, upon viewing the trial and reviewing the papers submitted in regard to this motion, the court cannot conclude that the jury reached a seriously erroneous result or that the verdict was a miscarriage of justice. Much of the testimony presented to the jury required a determination of credibility, and even without the presumption of favorability given to the plaintiff in examining a Rule 50 motion, the court cannot find that the jury's decision was in serious error. The defendant's Rule 59 motion for a new trial is therefore denied.

### D. Costs and Attorney's Fees

Originally presented with defendant's motions was plaintiff's motion for reasonable attorney's fees and costs pursuant to Fed. R.Civ.P. 54. However, since that motion was filed, the parties have reached an agreement as to the payment and amount of such fees, and so, the court need not address plaintiff's motion.

### III. CONCLUSION

In summary, the court denies defendant's Rule 50 and Rule 59 motions.

**IT IS SO ORDERED.**